KEARNS v. RAILROAD.

(Filed November 15, 1905).

*Railroads — Collisions — Negligence— Proximate Cause — Nonsuit—Sufficiency of Evidence—Burden of Proof.*

1. It is the duty of the judge to nonsuit, when the evidence is not legally sufficient to justify a verdict for the plaintiff.

2. In an action for damages for an injury from a collision, evidence which merely shows that it was possible that the failure to stop the train caused the injury, or merely raises a conjecture that it was so, is legally insufficient and should not be submitted to the jury.

3. In an action for damages for an injury from a collision, with defendant's train, the burden of proof was upon the plaintiff to show that the alleged negligence of the engineer in not stopping his train sooner than he did was not only the cause, but the proximate cause of the injury.

4. Evidence that the plaintiff, driving his horse and buggy, crossed the defendant's track and after he had gotten across and when distant from 15 to 40 feet and about the time the engine passed the crossing, the horse began to back and continued backing and backed into the cars; that the engineman was looking out at the plaintiff and slackened the speed of the train, which was going very slowly and after plaintiff's buggy struck it stopped very quickly, in 15 feet of the crossing according to one witness, and within two or three car lengths ·according to the plaintiff, *held,* that the plaintiff failed to make out a·case of actionable negligence.

HOKE, J., and CLARK, C. J., dissenting.

ACTION by Alexander Kearns against Southern Railway Co., heard by *Judge B. F. Long* and a jury, at the August Term, 1905, of the Superior Court of DAVIDSON County.

This action was commenced on December 7, 1904, to recover damages for an injury alleged to have been received by plaintiff on August 17, 1902, by coming in contact with a train of the defendant at Thomasville. At the conclusion of the evidence, His Honor, *Judge Long*, being of opinion that the plaintiff had failed to make out a case of actionable negligence, sustained defendant's motion to nonsuit, and dismissed the action. The plaintiff appeals.

*McCrary & Ruark* for the plaintiff.
*Manly & Hendren* for the defendant.

BROWN, J. The duty of the judge to nonsuit when the evidence is not legally sufficient to justify a verdict for the plaintiff, is too well settled to admit of dispute. It is the law in this State, long since declared by this court and recognized by the General Assembly. It is also the rule of practice in every court where the practice and principles of the common law prevail.

"We would be recreant to our duties as judges were we to fail to declare the law with respect to the question whether there is any evidence for fear of offending the jury. This question the jury do not decide." *Connor, J.,* in *State v. Smith,* 136 N. C., at page 687.

Evidence has a twofold sufficiency, a sufficiency in law and a sufficiency in fact. Of the former, the court is the exclusive judge; of the latter, the jury is. The measure and quantity of proof is a question for the court. When submitted to the jury, its weight and sufficiency to establish a fact is for them.

An issue is made up of one or more facts. Where the evidence fails to establish all these facts, either directly or by

rational deductions, as where there is a failure of evidence in respect to any material fact involved in the issue, then the evidence is not legally sufficient to justify a finding upon the issue it is offered to sustain, and it becomes the plain duty of the judge to instruct accordingly, for in such case the jury has no duty to perform.

We agree with His Honor that the plaintiff in this action has failed to make out a case of actionable negligence. To establish actionable negligence the plaintiff must show by the greater weight of evidence, not only that the engineman was guilty of some negligent act, but also that such negligent act was the proximate cause of the injury. As clearly expressed by *Mr. Justice Walker:* "There must always, in actions of this kind, be a causal connection between the alleged act of negligence, and the injury which is supposed to have resulted therefrom. The fact that the defendant has been guilty of negligence, followed by an injury, does not make him liable for that injury, which is sought to be referred to the negligence, unless the connection of cause and effect is established, and the negligent act of the defendant must not only be the cause, but the *proximate* cause, of the injury." *Byrd v. Express Co.* (at the present term).

The burden of proof is therefore upon this plaintiff to show that the alleged negligence of the engineman in not stopping his train sooner than he did was not only the cause, but the proximate cause of the injury. The law requires him to establish that fact by a clear preponderance of proof as much so as it does the fact of negligence. The proof must be of such strength and character as to warrant the inference that the failure to stop caused the injury, and not merely to raise a surmise or conjecture that such was the fact. Evidence which merely shows that it was possible that such was the result, or raises a conjecture that it was so, is legally insufficient, and should not be submitted to the jury. *State v. Vinson,* 63 N. C., 335; *Brown v. Kinsey,* 81 N. C., 245.

"The plaintiff must do more than show the possible liability of the defendant for the injury. He must go further, and offer at least some evidence which reasonably tends to prove every fact essential to his success." *Byrd v. Express Co., supra.*

Applying these well settled principles, we have concluded that the plaintiff has failed to show that the alleged negligent act of the engineman in not stopping his train sooner than he did caused the injury, and therefore he cannot recover.

The facts, as gathered from the testimony of the plaintiff and his witness, Elliott, who alone testified as to the occurrence, are these: On August 17, 1902, plaintiff, driving his horse and top buggy, crossed the defendant's tract in the town of Thomasville. After he had gotten across, and when distant from 15 to 40 feet from the track crossing, and about the time the *engine* passed the crossing, the horse began to back and continued backing and backed into the cars, about the second or third coach. Plaintiff testifies: "I had just crossed the track and the horse began to cut up and ran back and backed the right wheel against the cars and threw me between the shafts and the horse, under his feet. The first time I saw the train the horse wheeled right around towards Lexington and cut up and I could not see anything. I was something over the length of the horse and buggy when train came along the track." Plaintiff states that then the horse began to back and he urged him forward. "I do not know as I said my horse was an old fool, but *she was an old fool* or else she would not have run back that way." Elliott testified in substance that about the time the engine passed the crossing the horse began to back and kept on backing and backed into the train. The engineman was looking out at plaintiff and his horse. He slackened up the speed of the train. It was going at a very slow rate of speed. The engine, tender and several cars had passed before plaintiff's buggy struck the train. He also testified that the train stopped very

quickly, but he did not hear the brakes applied, being 150 feet distant. The train was going *very slowly,* and after plaintiff's buggy struck it stopped very quickly. He further stated that the engineman shut off steam and slowed up when he saw the horse backing. The engineman could not have seen the horse "cut up" before the engine got on the crossing, because the horse did not begin to back and "cut up" until then. Witness said that he could see the engineman looking out of his window. "He was going very slowly, looking at this man. Stopped very quickly. Went about ten or fifteen feet, apparently holding his train under control, looking at this situation."

In view of the fact that the engineman was on the crossing with his engine when he saw the horse commence to back, and brought his train to a standstill in 15 feet of the crossing according to the witness, Elliott, and within two or three car lengths, according to plaintiff, it is very doubtful if there is any negligent conduct upon the part of the engineman disclosed by the evidence. But, assuming there is such evidence, in our opinion there is nothing which tends to prove that the alleged negligent conduct caused the damage to the plaintiff or his buggy. This is not a case where the train ran over or backed into the plaintiff, but where the plaintiff backed into the train. While there is no evidence offered that the engineman could have stopped his train any sooner than he did after first seeing the horse "cut up," yet, assuming that he could have done so and that the train was at a standstill at the moment the horse backed the right buggy wheel into the car, we think no rational inference can be drawn that the result to the plaintiff and his buggy would have been otherwise than it was. There is no affirmative proof whatever that the stopping of the train a moment sooner would have prevented the contact with the buggy wheel or the resultant injury. In view of the lack of evidence, to submit that question to the jury would be to refer it to the domain of guesswork and con-

jecture for solution. The engine was on the crossing when the horse began to back. That was the earliest moment that the engineman could have discovered plaintiff's situation. Suppose he had stopped his engine and train instantaneously (although we do not know it to be possible), what would have been the evident consequence to the plaintiff? His horse would have backed his buggy into a hissing and steaming engine, a much more dangerous predicament. There is no evidence that the engineman could have so quickly reversed his engine as to back it out of plaintiff's way, and that was hardly possible in so short a time. There is not the slightest evidence that the car steps caught into the wheel and dragged the buggy any distance, or that the wheel struck the steps, as alleged in the complaint. When the frightened horse backed the right hind wheel against a very slowly moving car, it was well calculated to "smash the wheel" and pitch the plaintiff out between the shafts and horse by the force of the impact alone, and not because the car was moving. The same result would doubtless have happened had the horse backed with the same force against a stone wall. If the train had been moving rapidly, its momentum might possibly have drawn the buggy and its occupant under it when the horse backed the buggy into it. On the contrary, it was moving with such exceeding slowness that it came to a full stop very quickly, almost immediately after the contact, so that some person safely alighted and got hold of the horse's head, and the plaintiff was pitched forward instead of backwards or alongside or under the cars. The plaintiff has failed to establish by evidence any circumstances from which it can be fairly inferred that there is reasonable probability that the accident resulted from the failure of the engineman to stop the train sooner than he did, assuming that he could have done so, which is by no means certain. The plaintiff has failed to show that the alleged negligence was, in the expressive language of *Mr. Justice Hoke,* "the cause that produced

the result in continuous sequence and without which it would not have occurred; and one from which any man of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed." *Ramsbottom v. R. R.,* 138 N. C., at page 41.

We are of opinion that the proximate cause was (to quote the language of the plaintiff) "the old fool horse."

Affirmed.

HOKE, J., dissenting: I differ from the court in its decision of this case, and while no question of law is seriously involved, the difference as to its application to the facts before us, is sufficiently pronounced to justify some statement of the reasons for my dissent.

It is accepted law in actions of this character that when two men of fair minds can come to different conclusions on the question of actionable negligence, the jury must determine the issue; and that this applies not only to the negligent act, but to the question of proximate cause.

It is also the better doctrine that where the negligent act has been established or admitted, it is only in clear and exceptional instances that the question of proximate cause should be withdrawn from the jury and determined by the judge.

Shearman & Red., Neg., vol. 1, sec. 52; Thompson's Com. on Law of Neg., vol. 1, sec. 161.

Another position may be considered as established; that when a judge withdraws a case from the jury by directing a nonsuit, the evidence favoring the plaintiff must be taken as true. *Hopkins v. Railroad,* 131 N. C., 464; *Biles v. Railroad,* at this term.

The court does not seem to have been altogether advertent to this last principle; for, in the opinion, apparent consideration is given to evidence favoring the defendant in certain phases of the case where there was other evidence contradictory or qualifying which was more favorable to plaintiff.

This matter is not dwelt upon at much length, or in greater detail for the reason that in any aspect of the case, I am of opinion that the ruling of the judge below cannot be sustained.

Applying the above rules to the facts before us, as I understand them: Here was a man over 80 years of age, in a top-buggy, who had just driven over a crossing of defendant's railroad, when a passenger train of defendant company passed the crossing, going north. The railroad ran about north and south here. The plaintiff had just driven over, being something over the length of the horse and buggy, as he states it; was from 15 to 20 feet from crossing, as the witness Elliott states it; and as the train went by the crossing, the horse commenced backing the buggy towards the train. The road sloped upward some towards the crossing, and as the train moved on, going the distance of several car lengths, the horse continued to back the buggy up the slope, till the train and the buggy collided. The right hind wheel of the buggy was crushed down; the old man thrown from his seat on to the fore wheel, falling under the shafts, between the horse's heels and received severe injuries, from which he still suffers. During the time the horse was backing, the engineer was looking directly at him. A collision was evidently imminent for some one jumped from the train and caught the horse by the bridle in an effort to avoid the catastrophe, "but the train moved on." The witness, Elliott, a merchant in Thomasville, who had no interest in the matter, so far as appears, and who had the entire occurrence in full view, at a distance of not more than 134 feet from the center of the crossing, testifies in part, as follows: "To the best of my recollection, about the time the engine passed the crossing, the horse began to back and kept on backing and backed into the train. I saw the engineer looking out of the window, and some one else stepped from the train. The engineer was looking at Mr. Kearns and his horse. He apparently 'kinder'

slacked up the speed of the train; it seemed so.  Then he kept
looking back after the engine had passed, and just after he
struck the train, he put on brakes and stopped the train.  It
was going at a very slow rate of speed.  The engine, tender
and several cars had passed before he struck it.  I don't know
the manner in which the train was stopped.  I know it
stopped very quickly  *  *  *  The train was going along
very slowly, not trying to make good time, and after it struck,
it stopped very quickly  *  *  *  It seemed that he slowed
up after he saw the horse start to backing; he 'kinder' shut
off steam, apparently.  The train stopped very quickly after
he was hit.  I saw Kearns.  I do not know how badly he was
hurt  *  *  *  I live on the south side of the track.  That
is the side the engineer was on.  I could see him looking out
of his window.  He was going very slowly, looking at this
man.  He stopped very quickly.  He went about 10 or 15
feet.  He was apparently holding his train under control,
looking at this situation  *  *  *  The horse's head was
pointed south and when he commenced going back, he gave
a cut and went back against the train; his head was in a
westerly direction.  The horse and buggy were going back-
ward  *  *  *  It was just an incline; I do not know what
degree; 10, 15 or 20 degrees.  It was a gradual incline down
to where the horse was."

There are several points in the testimony of this witness
which may be noted as a help to the true understanding of the
matter.  Thus, "I saw the engineer looking out of the win-
dow, and some one else stepped from the train.  *  *  *  The
engineer was looking at Kearns and his horse; he apparently
slacked the speed of the train.  It seemed so.  Then he kept
looking back, and just after he struck the train, he put on
brakes and stopped the train  *  *  *  The train stopped
very quickly after he was hit  *  *  *  He stopped very
quickly; went about 10 or 15 feet.  He was apparently hold-
ing the train under control, watching the situation."

These facts make out a clear case of negligence. The engineer in the exercise of ordinary prudence, should have stopped the train when he saw that a collision was imminent; it is almost equally as clear that the movement of the train had something to do with the nature and extent of the injury.

The opinion substantially admits that there was negligence in not stopping the train outright, and sustains the ruling of the court below on the ground that there is no evidence that the motion of the train had anything to do with causing the injury; and that this is so clear there can be no two opinions about it among fair minded men.

A dissertation on the momentum possessed by bodies of vast weight and tremendous power, though moving slowly, might be of service here, but I find it difficult to discuss this last position with that seriousness which is always becoming when making final deliverance on the rights of parties and which the great respect entertained for my brethren always prompts. To hold that the movement of the train, though negligent, had nothing to do with causing or contributing to the plaintiff's hurt, to my mind involves the proposition that when a 400,000 pounds train in motion collides with a 300 pounds buggy and a 900 pounds horse also in motion, in which the wheel of the buggy is crushed down and the occupant thrown from his seat, causing him to fall beneath the horse's heels, the motion of the train had nothing whatever to do with intensifying the shock or increasing the damage, and that this is so clear that there can be no two opinions about it.

The reasons given in support of the position are no more satisfying than the position itself. It is urged that the train was going "slowly, very slowly." This is a comparative term and does not mean the same thing when speaking of trains as in slower methods of locomotion. Thus, the witness, Elliott, says at one place, "It was going along very slowly, not trying to make good time." However this may be, it was

KEARNS *v.* RAILROAD.

going forward faster than the horse was backing, for it had gone three or four car lengths while the horse had backed from 15 to 40 feet. It is also suggested that there is not the "slightest evidence that the car steps caught in the wheel and dragged the buggy any distance, or that the wheel struck the steps, as urged in the complaint." No, the evidence is silent on these points. No one seems to have noted just what part of the car came in contact with the buggy, nor which way the wheel was dragged. The first point was probably considered of no consequence, and any evidence on the second was more than likely effaced in the crush and wreck of the offending wheel.

It is also repeated, in aid of the defendant's engineer, that after the collision the train was stopped very quickly, but I cannot see how that can help the defendant. The train had gone 10 or 15 feet beyond the point of contact, and stopping it quickly only tended to show that the engineer had his train under full control and could readily have stopped in time to avoid the injury if he had so desired. As to the plaintiff, the injury had been already done, and the train could have proceeded on its way north and not added one whit to the plaintiff's grievance or his injury.

It might be suggested in support of plaintiff's position as a matter of common observation, that under all the conditions described by this testimony, a buggy could have backed up that incline at the rate described, against a stationary object, and it would not have crushed a buggy wheel of ordinary strength one time out of ten, or even one hundred; the only other element present was the motion of the train, and the strong probability is that this motion either caused, or greatly intensified the injury.

It would seem almost to permit the application of the principle *res ipsa loquitur* and that neither evidence nor further argument is required. I agree with my brethren that there

cannot well be two opinions on the question, but the conclusion should be the other way.

CLARK, C. J., dissenting: I concur in what is so admirably said by *Mr. Justice Hoke*. Whether the proximate cause of the plaintiff's injury was his owning a "foolish" little horse, over which he lost control, and which backed the buggy and its occupant up a steep hill against the car, or whether it was the act of the defendant's servant in crushing into the buggy with the energies of steam and the weight of a heavy train of cars, which, notwithstanding he had under perfect control, and with full knowledge that the plaintiff could not control his horse, was a matter of fact eminently for a jury to decide. If "only one inference could be drawn" it would be that the proximate cause was the vastly greater power of steam which was under the control of the defendant's servant. In this collision between the backing horse and the moving train, not only was the impact of the latter the greater force, but there was negligence on the part of the defendant and none on the part of the plaintiff. How much of the damage was due to the neglect and default of the defendant was a matter which only a jury can determine. If there had been no negligence by the defendant, the injury would have caused it no liability, but the defendant's negligence is clear. In *Craft v. Railroad,* 136 N. C., 49, the court holds that "on a motion for nonsuit the evidence of the plaintiff must be taken as true and construed in the light most favorable to him, and if there is more than a scintilla of evidence tending to prove the plaintiff's contentions, the question must be left to the jury, who alone can pass upon the weight of the testimony and the credibility of witnesses." To the same purport are *Cox v. Railroad,* 123 N. C., 604; *Coley v. Railroad,* 129 N. C., 407; 57 L. R. A., 817; *Hopkins v. Railroad,* 131 N. C., 463, and *Butts v. Railway,* 133 N. C., 82.

In *Purnell v. Railway,* 122 N. C., 832, the court holds that "a motion of nonsuit is substantially a demurrer to the

plaintiff's evidence   *   *   *   Every fact which the plaintiff's evidence proved or tended to prove must be taken by the court to be proved. It must be taken in the strongest light as against the defendant." The same view is taken in *Printing Co. v. Raleigh,* 126 N. C., 516; *Gibbs v. Lyon,* 95 N. C., 146; *Springs v. Schenck,* 99 N. C., 551; 6 Am. St. Rep., 552. And in *Snider v. Newell,* 132 N. C., 614, *Connor, J.,* speaking for the court, says: "The demurrer to the evidence admits the truth of the plaintiff's testimony, together with every reasonable inference to be drawn therefrom most favorable to the plaintiff. *Brittain v. Westhall,* 135 N. C., 492."

The theoretical proposition that the only inference which could reasonably be drawn was that the *causa causans* lay with the little horse, backing buggy and driver up hill, is met by the fact that two members of this court draw a different inference. There is no place to apply a theory when the foundation fact, which would deprive the plaintiff of the sacred right of trial by jury, is lacking.

The Constitution, Art. I, sec. 19, declares that "the ancient mode of trial by jury is one of the best securities of the rights of the people, and ought to remain sacred and inviolable." The guaranty of the right of trial by jury is traced back with pride to the words of Magna Charta, *"legale judicium parium suorum."* The disparity of power between John and his armed barons was not great, and indeed at Runymede, the latter were the stronger. If the right of trial by a jury of one's peers should have been guaranteed to the barons against the king, certainly it should be still more sacred when the controversy, as here, is between a citizen of humble means more than 80 years of age, on the one hand, and on the other a powerful corporation with its roads extending into many States, with (as we know from the official reports of both State and Federal governments) nearly $50,000,000 of annual receipts, more than $16,000,000 of which are in excess of its operating expenses, and with influence extending to

every sphere of activity, State and Federal. If ever the right of trial by jury should be held sacred, it is between litigants of such disproportionate power.

Constitutional guaranties, like that of a trial by jury, are the necessities of the weak and humble. The great and powerful can get their dues (if not more) without such aid. Therefore, such right should be always sacredly guarded and never dispensed with. If a judge can dispense with a jury trial because he thinks that upon the evidence the verdict ought not to be in favor of the plaintiff, then the judge, not the jury, tries the case and weighs the evidence, whether it is "reasonably sufficient" to justify a recovery. Why carefully forbid the judge to express an opinion "whether a fact is fully or sufficiently proved," Code, sec. 413, if the judge can decide that the "evidence is not sufficient" to justify a verdict for the plaintiff and refuse to submit the cause to the jury.

The ancient landmark was that if there is "any evidence beyond a scintilla" either party has a right to have the jury pass upon the evidence, leaving it to the judge in the interest of justice to set aside the verdict if palpably erroneous. *Jordan v. Lassiter,* 51 N. C., 133. This was fully debated and reiterated in *Wittkowsky v. Wasson,* 71 N. C., 451, where *Bynum, J.,* with great foresight and to his lasting honor, in a dissenting opinion of great force, combatted the "new and dangerous proposition" as he termed it, which was intimated by the majority opinion that "any evidence" could be construed to mean such "as reasonably to satisfy the jury." As he clearly perceived and earnestly insisted, this would take the right of trial by jury out of the rank of a constitutional guaranty and make it discretionary with the judge.

"Power is ever stealing from the many to the few." Here, two out of five members of this court are of opinion that there was not only evidence, but indeed that the weight of the evidence was in favor of the plaintiff. The counsel for the de-

fendant railroad evidently thought that the jury would also find the facts against him, else he would not have been so anxious to prevent their being submitted to the jury. In the differing opinion of the members of this court as to what the evidence proves, the actual and real result is that the defendant is exonerated by the opinion of a bare majority of five men as to the weight of evidence, and the plaintiff does not receive the benefit of his constitutional right to have the weight of the evidence passed upon by a jury of twelve men "of the vicinage." Yet in cases of any doubt, the citizen should always be granted the protection claimed.